THE STATE *v.* HARRISON, a Slave.

The Act of 15th of March, 1855, entitled " an Act relative to slaves and free colored persons," is unconstitutional, because its title expresses two distinct objects, to wit, slaves and free colored persons, and because many of the sections of the Act embrace objects not expressed in the title.

Slaves and free colored persons embrace two classes, which it is impossible to confound in legal parlance ; for in the eye of the Louisiana law there is, with the exception of political rights, social privileges, and the obligations of jury and militia service, all the difference between a free man of color and a slave, that there is between a white man and a slave

This court cannot say, that one of the objects comprised in the title of the Act in question, was more in the contemplation of the Legislature than the other, nor select between the two objects expressed, and to sustain those portions of the statutes which are applicable to the object they selected, to the exclusion of the other expressed object, not to speak of the other and widely various objects embraced in the numerous sections of the statute. The whole act is liable to the same objection, and the whole is void for unconstitutionality.

The doctrine of all American courts is, that a Legislative Act should not be declared void, unless its incompatibility with the paramount law be clear beyond a reasonable doubt. SPOFFORD, J., (with whom concurred LEA, J.) dissenting.

The argument that slaves are one object, and free colored persons another, overlooks the fact that both compose a single, homogeneous class of beings, distinguished from all others by nature, custom and law, and never confounded with citizens of the State. No white person can be a slave ; no colored person can be a citizen. A slight change of phraseology without any change of substance, will show that there is unity in the object of the law in question, as indicated by its title ; it is an act *relative to persons of color whether bond or free.* The division of this class of persons into bond and free, does not duplicate the object of the law which was intended to regulate the entire class. SPOFFORD, J. (with whom concurred LEA, J ) dissenting.

The design of a title is merely to indicate the general subject of the law, and not to furnish a detailed exposition of its provisions. If the latter were the case, it would lead us to the absurd conclusion that the title should be as long as the act, unless indeed the act abounded in tautology and surplusage. What good sense would dictate is what the Constitution exacts, namely, that by some general but concise expression at the head of the law, the attention of both legislator and citizen should be fixed upon the main subject-matter to which all the details in the body of the statute are auxilliary. SPOFFORD, J. (with whom concurred LEA, J.) dissenting.

APPEAL from a special tribunal organized for the trial of a slave, parish of East Feliciana. *Kernan,* District Attorney, for the State. *Mc Vea,* for appellant.

BUCHANAN, J. *Harrison* was tried by a tribunal composed of two Justices of the Peace and ten owners of slaves, in the parish of East Feliciana, for killing another slave, on the 2d July, 1855. He was found guilty as charged, and sentenced to imprisonment at hard labor for life. The case is presented to us by his counsel, entirely on the ground of the unconstitutionality of the Act of the Legislature under which the tribunal was organized for the trial of the prisoner; being the Act approved 15th March, 1855, entitled " an Act relative to slaves and free colored persons."

It is contended, that this Act is in violation of the Article 115 of the Constitution, which reads as follows: "Every law enacted by the Legislature, shall embrace but one object, and that shall be expressed in the title." This Article of our present State Constitution, is copied word for word from the 118th Article of the Constitution of 1845. Chief Justice Eustis, who was a prominent member of the Convention which formed the Constitution of 1845, has given us (in the case of *Walker* v. *Caldwell,* 4 Ann. 297) the following reasons for the enactment of the Article under consideration : "The condition of our statute law was such, at the time of the formation of the Constitution,

as to impose on the Convention the necessity of providing in the Constitution itself for the forms of legislation. The title of a law often afforded no clue to its contents; important general provisions were found placed in Acts private or local in their operation; provisions concerning matters of practice or judicial proceedings were, sometimes, in the same statute with matters entirely foreign to them." It was to prevent such anomalies, that the Constitution requires the Legislature to confine each Act to a single object, and to indicate distinctly that object in the title of the Act. Does the Act of 15th of March, 1855, "relative to slaves and free colored persons," fulfil those conditions of legislative form?

In answering that question, we are first to observe, that the title of the Act expresses two distinct objects, to wit: slaves and free colored persons. Again, the Act contains one hundred sections, many of which embrace other objects than those expressed in the title. Thus, sections 18, 19, 20, 21, 22, 23, 25, 26, 27, 28, 29, 30, 31, 32, 34, 35, 36, 37, 38, 66, 67, 68, 69, 89, 90 and 91, treat of offences committed by any free person, white or colored. Section 33 enacts a lien or privilege on vessels. Section 61, and several other sections, restrict the control of masters, of whatever color, over their slave property. Section 70 introduced a new redhibitory action. Section 74 relates to fees of district attorneys.

Of the other sections of this Act, the following have slaves for their object: Sections 1, 2, 3, 4, 7, 9, 10, 11, 13, 14, 16, 17, prescribe the penalties for crimes and offences committed by slaves. Sections 39 to 51 inclusive, and 54 to 60 inclusive, determine the mode of proceeding for the trial, and of punishment in case of conviction, of slaves accused of crimes. Sections 52 and 53 provides a compensation to owners of slaves condemned to death or perpetual imprisonment. Sections 62 to 65 inclusive, relate to the police of slaves. Sections 71 to 73 prescribes a new mode of procedure for the emancipation of slaves. Section 75 lays down a rule of evidence in relation to claims for freedom made by slaves. Sections 75 to 87 inclusive, relate to runaway slaves, to depots for their reception, and the costs of their imprisonment. Section 99 prohibits slaves from being witnesses against free colored persons either in civil or criminal matters, with certain exceptions.

The following sections relate entirely to free colored persons: 88, 92, 93, 94, 95, 96, 97, 98.

We perceive, by this analysis of the statute, that its objects are multifarious and that its title expresses two of those objects. It remains to be seen how much of this statute can be considered as valid, under the provisions of Article 115 of the Constitution.

In two cases which immdiately follow each other in 5 Ann., *The State* v. *Hackett*, and *Duverges* v. *Salter & Marcy*, our predecessors, through Chief Justice Eustis, passed upon the construction of Article 115, (or 118 of the Constitution then existing,) as applicable to the avoidance of statutes inconsistent in form with its provisions. In the case of *Hackett*, the title of the statute was, "an Act to regulate and define the fees to be paid for the arrest and confinement of slaves." But besides fixing the fees for such purposes, the statute went on to provide a new place of confinement in the parish of Orleans for runaway slaves, in the place of that fixed by previous laws. The court held the latter portion or the statute to be in violation of the Article of the Constitution and void; and added: "In deciding that the portion of the law under

which the Sheriff claims is unconstitutional, we are not to be 'considered as saying that those portions of the statute which are covered by the title, are unconstitutional; the decision of the latter point not being necessary."

In the case of *Duverge's Heirs* v. *Salter & Marcy*, the majority of the court declared the whole of an Act of 1848, "to give jurisdiction to the District Courts of New Orleans over causes arising under the Act of 1819, respecting landlords and tenants," to be unconstitutional, because the statute went further than barely to give the jurisdiction expressed in the title, and prescribed certain rules of procedure; while Judge Slidell, dissenting, was in favor of separating that portion of the law, the object of which was embraced in its title, from that portion which was foreign to its title.

But in each of those cases reported in the 5th Annual, the title of the statute, at least, was regular. It expressed but one object, and there might therefore possibly be some portion of the statute which could be held to be valid, to wit, that portion which embraced the single object expressed in the title. Whereas, in the Statute of 1855, now under consideration, there are two objects expressed in the title—the slave, and the free colored person—two classes which it is impossible to confound in legal parlance; for in the eye of the Louisiana law, there is, (with the exception of political rights, of certain social privileges, and of the obligations of jury and militia service,) all the difference between a free man of color and a slave, that there is between a white man and a slave.

The free man of color is capable of contracting. He can acquire by inheritance and transmit property by will. He is a competent witness in all civil suits. If he commits an offence against the laws, he is to be tried with the same formalities, and by the same tribunal, as the white man.

The slave, on the contrary, is the object of contracts, not a legal party to contracts. He may be sold or mortgaged, but he cannot sell or mortgage. He can neither inherit, nor make a will, because he can possess nothing as owner. He is inadmissible as a witness in any civil suit whatever. And if accused of crime, he is tried by a special tribunal, to which the safeguards of the common law are unknown.

It has been suggested, that we may consider the objects expressed in the the title of this Act of the Legislature as one, by reading the title thus : "an Act relative to colored persons, whether bond or free."

The first answer to this suggestion is, that it changes the idea of the legislator, by condensing into one class what *he* has said should constitute two classes. And, in truth, the proposed condensation is more specious than real. For if we say, "colored persons, whether bond or free," do we not in substance say, "slaves and free colored persons"? In both forms of locution we make a distinction; and in making a distinction, we recognize a difference.

It is evidently impossible for the court to say, that one of the objects comprised in the title of the Act in question, was more in the contemplation of the Legislature than the other. *We* cannot undertake to select between the two objects expressed in the title, and to sustain those portions of the statute which are applicable to the object thus selected, to the exclusion of the other expressed object, not to speak of the various other and widely different objects embraced in the numerous sections of the statute. The whole act is liable to the same objection, and the whole must consequently be declared void for unconstitutionality.

In coming to this conclusion, we have the satisfaction of knowing, that we nave left no hiatus in the legislation of the State; as each and every one of the ninety-nine enacting sections of this Act is copied, with trifling verbal alterations, from preëxisting statutes, with the exception of sections 71, 72 and 73, which treat of the mode of proceeding for the emancipation of slaves.

As to its effect upon this cause, the conclusion at which we have arrived in relation to the constitutionality of the Act of 1855, will not relieve the prisoner *Harrison* from the sentence, which is the foundation of this appeal. For those sections of that Act, which relate to the organization of tribunals for the trial of slaves accused of crimes, are copied from an Act of June 1st, 1846, entitled "an Act relative to trials of slaves." Session Acts, page 114. The proceedings in the case at bar, were regular under that statute, which, in our view, is still in force. By the 14th section of that Act, no proceeding in accordance therewith, shall be annulled or impeded by any error of form.

The judgment appealed from, is therefore affirmed, with costs.

SPOFFORD, J., (with whom concurred LEA, J.) dissenting. The doctrine of all American courts is, that a legislative act should not be declared void, unless its incompatibility with the paramount law be clear beyond a reasonable doubt.

It is contended that there is a twofold defect in the Statute of 15th March, 1855, "relative to slaves and free colored persons." (Session Acts, p. 377.) First, that it embraces two or more objects; and, secondly, that it does not express its object in its title. The statute is therefore said to be doubly unconstitutional.

The argument that slaves are one object, and free colored persons another, overlooks the fact, that both compose a single, homogeneous class of beings, distinguished from all others by nature, custom and law, and never confounded with citizens of the State. No white person can be a slave; no colored person can be a citizen. A slight change of phraseology, without any change of substance, will show that that there is unity in the object of the law in question, as indicated by its title; it is an Act *relative to persons of color, whether bond or free.* The division of this class of persons into bond and free, does not duplicate the object of the law which was intended to regulate the entire class. Every "object" is infinitely divisible. Slaves are subdivided into *statu liberi* and slaves for life. Could it be successfully urged that an Act "relative to slaves for life and *statu liberi*" was unconstitutional and void, for duplicity in its title and object? The case before us seems to be a parallel one.

Dismissing then the first objection, let us proceed to inquire whether the title of this law is not expressive of its object, in that reasonable sense in which the Article 1115 of the Constitution has hitherto been interpreted. The design of a title is merely to indicate the general subject of the law, and not to furnish a detailed exposition of its provisions. If the latter were the case, it would lead us to the absurd conclusion, that the title should be as long as the Act, unless indeed the Act abounded in tautology and surplusage. What good sense would dictate is what the Constitution exacts, namely, that by some general but concise expression at the head of the law, the attention of both legislator and citizen should be fixed on the main subject-matter to which all the details in the body of the statute are auxiliary. What have we here? "An Act relative to slaves and free colored persons." What simpler or more comprehensive title could have been selected? What better fitted to strike the

eye and call the attention of a person seeking for information upon any one of the subordinate topics which fill up the one hundred sections of this Act, so various in their details, but yet so subservient to the one great purpose of the Act itself, which is to regulate and keep in order all people of color. Their crimes and offences, as well as the crimes and offences of others against them or in relation to them, their police, the emancipation of slaves, or their conversion into free people of color, and their trial and punishment for crime, are subdivisions of the single object from which the statute never wanders. Although, for instance, section 74 fixes a fee for the District Attorney, still it is a fee for defending a suit instituted by the master for the purpose of emancipating his slave, and is therefore strictly incidental to the object of the Act. And the same is true of every other section; they are all germain to the subject indicated by the title.

The Constitution of Louisiana is not singular or original in respect of the provision under discussion. An analogous provision is to be found in the Constitutions of many of our sister States. I think, in its origin, it was intended as a guard against legislative coalitions for the purpose of carrying measures in combination, neither of which could be carried singly. Indeed, such was declared to be its object in the State of New York, by the highest authority. Mr. Chief Justice Ruggles, in *Conner* v. *Mayor, &c.*, 1 Selden, 272, remarked : "The design of the constitutional provision was to prevent the uniting of various objects having *no necessary or natural connection with each other*, in one bill, for the purpose of combining various pecuniary interests in support of the whole, which could not be combined in favor of either by itself."

It is obvious that no such vice infects the law before us. Nor does this law appear to be pregnant with any of the mischiefs sought to be prevented by the 115th Article of our Constitution, as expounded by Mr. Chief Justice Eustis, in the case of *Walker* v. *Caldwell*, 4 Ann. 297, for its title affords a ready clue to its contents ; it is not an Act private and local in its operation, containing important general provisions beyond its ostensible scope; nor does it conjoin provisions touching matters of practice or judicial proceedings with matters entirely foreign to them.

No portion of the statute could operate a surprise either upon legislator or student, as neither could be misled by the title.

On the contrary, the Act is truly an attempt to simplify and expedite the task of searching after the law, by grouping in one general statute, under a title which challenges attention, all those legislative provisions relative to people of color, which would really be less accessible to the public if they were dispersed through a multitude of statutes, although dissected and arranged with scholastic skill.

Being, therefore, of opinion that the law under which the prisoner was tried and convicted, violates no provision of the Constitution, I think the judgment appealed from should be affirmed.